# FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE  OCT 1 7 2013

*Madsen, C. J.*
CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on Oct 17 2013

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

FREEDOM FOUNDATION, a Washington nonprofit corporation, )

          Appellant, )

v. )

CHRISTINE O. GREGOIRE, in her official capacity as governor of the state of Washington, )

          Respondent. )

No. 86384-9

EN BANC

Filed: _____ OCT 1 7 2013 _____

FAIRHURST, J.—We must decide whether Washington's constitutional separation of powers creates a qualified gubernatorial communications privilege that functions as an exemption to the Public Records Act (PRA), chapter 42.56 RCW. Freedom Foundation (Foundation) sued the governor to compel production of documents under the PRA after the governor asserted executive privilege and refused to release them. The parties filed cross motions for summary judgment. The trial court resolved these motions by ruling that separation of powers principles produce a qualified gubernatorial communications privilege. Because

the Foundation made no attempt to overcome this qualified privilege, the trial court granted the governor summary judgment. Finding no error, we affirm.

## I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This case began when Scott St. Clair, a Foundation employee, e-mailed the office of the governor and made a public records request for 11 specific documents. St. Clair knew the governor had claimed executive privilege and refused to produce these documents in response to other public records requests.

The governor's staff re-reviewed each document to see if the governor could now waive the privilege without harm. The governor waived the privilege for five documents and part of a sixth document. She continued to claim privilege for part of the sixth document and five other documents. The withheld documents involved the negotiations to replace the Alaskan Way Viaduct in Seattle, the Columbia River Biological Opinion, and proposed medical marijuana legislation. With the produced documents, the governor included a privilege log and a letter from the governor's general counsel. The privilege log and letter identified the withheld documents, their authors and recipients, their subject matter in general terms, and explained that the governor was asserting executive privilege to protect her access to the candid advice needed to fulfill her constitutional duties.

Dissatisfied, the Foundation filed suit in Thurston County Superior Court to compel production of the documents under the PRA. Both sides sought summary judgment.

The governor asked the trial court to follow decisions from federal and other state courts and recognize an executive communications privilege deriving from the separation of powers implied in the Washington State Constitution. The governor asked the trial court to analyze the privilege claim using the three-step framework created by the United States Supreme Court in *United States v. Nixon*, 418 U.S. 683, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974). In *Nixon*'s first step, the governor or the governor's representative creates the presumption that a document is privileged by stating that he or she has reviewed the document and "determined that it falls within the privilege, because it is a communication to or from the Governor that was made to foster informed and sound gubernatorial deliberations, policymaking, or decision-making; and that production of the document would interfere with that function." Clerk's Papers (CP) at 237; *Nixon*, 418 U.S. at 713. *Nixon*'s second step requires the party requesting the production of documents to overcome the presumption of privilege by "demonstrating a particularized need for the documents and identifying an interest that could outweigh the public interests and constitutional interests served by executive privilege." CP at 237; *Nixon* 418 U.S. at 713. If the party makes a sufficient showing, *Nixon*'s third step requires the

trial court to examine the documents in camera and balance the constitutional and public interests served by the privilege against the demonstrated need for the documents. *See* 418 U.S. at 714-15. If the need outweighs the interests served by the privilege, the trial court must order the release of the documents. The governor stressed that under *Nixon*, to compel production, the Foundation had to demonstrate some specific, individualized need, which the Foundation had not demonstrated.

The Foundation maintained that Washington's spirit of open government prevented recognition of an implied executive privilege. The Foundation argued that even if the trial court recognized an executive privilege, the trial court should refuse to apply the privilege to the PRA for two reasons. First, RCW 42.56.070(1) allows only specified statutory exemptions to the PRA's disclosure requirements and an implied constitutional privilege would not satisfy this requirement. Second, the *Nixon* test clashes with procedural provisions of the PRA, especially the provisions related to who has the burden to justify nondisclosure and the availability of in camera review. Based on its view of the primacy of the PRA, the Foundation refused to provide an alternative to the *Nixon* test to evaluate privilege claims within the context of the PRA and refused to show any need for the documents.

Based on separation of powers considerations, the trial court recognized an executive communications privilege. Given the Foundation's failure to provide an alternative to the *Nixon* test, the trial court applied the *Nixon* test. The trial court determined that the general counsel's letter to St. Clair had created a presumption of privilege, satisfying *Nixon*'s first step. The trial court ruled that the Foundation had demonstrated neither a showing of particularized need nor an interest in obtaining the documents that outweighed the public and constitutional interests served by the privilege. The trial court also ruled that RCW 42.56.070(1) incorporated constitutional privileges as an exemption to the production of documents. Further, the trial court determined that if the PRA required a specific statutory citation for executive privilege, RCW 43.06.010 provided such a citation.[1] The trial court rejected the Foundation's request to order production of the documents and granted the governor's motion for summary judgment.

The Foundation sought direct review, which we granted.

## II. STANDARD OF REVIEW

We review a trial court's grant of summary judgment de novo, performing the same inquiry as the trial court. *Neighborhood Alliance v. Spokane County*, 172 Wn.2d 702, 715, 261 P.3d 119 (2011). Summary judgment is appropriate where no

---

[1]This provision describes the powers and duties of the governor and authorizes the governor to exercise the powers "prescribed by the Constitution." RCW 43.06.010.

5

genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Wash. Imaging Servs., LLC v. Wash. State Dep't of Revenue*, 171 Wn.2d 548, 555, 252 P.3d 885 (2011). The parties agree that no material issue of fact exists here.

## III. ISSUES PRESENTED

(1)  Does Washington's separation of powers doctrine give rise to an executive communications privilege that serves as an exemption to the PRA?

(2)  Did the trial court properly determine that the executive communications privilege covered the documents at issue?

## IV. ANALYSIS

### A. The PRA

Initially passed as a citizen's initiative in 1972, the PRA serves to ensure governmental transparency in Washington State. *O'Neill v. City of Shoreline*, 170 Wn.2d 138, 146, 240 P.3d 1149 (2010). The PRA embodies "a strongly worded mandate for broad disclosure of public records." *Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 127, 580 P.2d 246 (1978). To effectuate this mandate, the PRA directs each agency to allow public access to "all public records, unless the record falls within the specific exemptions of subsection (6) of this section, this chapter, or other statute which exempts or prohibits disclosure of specific information or records." RCW 42.56.070(1) (reviser's note omitted). Under the PRA, the agency bears the burden of showing that records fall within a statutorily specified exemption.

6

*Neighborhood Alliance*, 172 Wn.2d at 715. To preserve the PRA's broad mandate for disclosure, this court construes its provisions liberally and its exemptions narrowly. *Bainbridge Island Police Guild v. City of Puyallup*, 172 Wn.2d 398, 408, 259 P.3d 190 (2011).

The Foundation maintains that RCW 42.56.070(1) requires the governor to produce the documents it seeks, stressing that neither the PRA nor any other statute recognizes an executive communications privilege.

The Foundation's reading of RCW 42.56.070(1) fails to recognize that the governor raises a constitutional privilege. We have recognized that the PRA must give way to constitutional mandates. *See Seattle Times Co. v. Serko*, 170 Wn.2d 581, 594-97, 243 P.3d 919 (2010) (discussing how constitutional fair trial rights may serve as an exemption under the PRA); *Yakima County v. Yakima Herald-Republic*, 170 Wn.2d 775, 808, 246 P.3d 768 (2011) (noting in dictum that the argument that constitutional provisions can serve as PRA exemptions "has force"). These decisions recognize that the constitution supersedes contrary statutory laws, even those enacted by initiative. *Wash. Ass'n for Substance Abuse & Violence Prevention v. State*, 174 Wn.2d 642, 654, 278 P.3d 632 (2012). If the governor has correctly ascertained that constitutional principles provide her with a privilege, the Foundation's PRA claim must fail.

B.     The Separation of Powers and Executive Privilege

We have long described the separation of powers as one of the "cardinal and fundamental principles" of our state constitutional system. *Wash. State Motorcycle Dealers Ass'n v. State*, 111 Wn.2d 667, 674, 763 P.2d 442 (1988). "Our constitution does not contain a formal separation of powers clause." *Brown v. Owen*, 165 Wn.2d 706, 718, 206 P.3d 310 (2009). "'Nonetheless, the very division of our government into different branches has been presumed throughout our state's history to give rise to a vital separation of powers doctrine.'" *Id.* (quoting *Carrick v. Locke*, 125 Wn.2d 129, 135, 882 P.2d 173 (1994)).

Our separation of powers jurisprudence guards the balance of powers between branches. While we have acknowledged the important role that separation of powers principles play in maintaining individual liberty, our separation of powers jurisprudence directly "protects institutional, rather than individual, interests." *Carrick*, 125 Wn.2d at 136 (citing *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851, 106 S. Ct. 3245, 92 L. Ed. 2d 675 (1986)). This recognizes that "the damage caused by a separation of powers violation accrues directly to the branch invaded," weakening its ability to check the other branches. *Id.* Consequently, we test for separation of powers violations by asking "'whether the activity of one branch threatens the independence or integrity or invades the

prerogatives of another.'" *Brown*, 165 Wn.2d at 718 (quoting *Carrick*, 125 Wn.2d at 135).

The executive communications privilege plays a critical part in preserving the integrity of the executive branch. Courts have widely recognized that the chief executive must have access to candid advice in order to explore policy alternatives and reach appropriate decisions. *Nixon*, 418 U.S. at 708; *Republican Party v. N.M. Taxation & Revenue Dep't*, 2012-NMSC-026, 283 P.3d 853; *State ex rel. Dann v. Taft*, 109 Ohio St. 3d. 364, 2006-Ohio-1825, 848 N.E.2d 472; *Guy v. Judicial Nominating Comm'n*, 659 A.2d 777 (Del. Super. Ct. 1995); *Hamilton v. Verdow*, 287 Md. 544, 414 A.2d 914 (1980); *Nero v. Hyland*, 76 N.J. 213, 386 A.2d 846 (1978). These same courts have recognized that the communications privilege ensures the chief executive access to such candid advice, promoting the effective discharge of the chief executive's constitutional duties. *Nixon*, 418 U.S. at 705-08; *Republican Party*, 283 P.3d at 866-68; *Dann*, 848 N.E.2d at 484; *Guy*, 659 A.2d at 783-84; *Hamilton*, 414 A.2d at 922; *Nero*, 386 A.2d at 853. Refusal to recognize the gubernatorial communications privilege would subvert the integrity of the governor's decision making process, damaging the functionality of the executive branch and transgressing the boundaries set by our separation of powers doctrine. *See Nixon*, 418 U.S. at 708 (calling the privilege "fundamental to the operation of Government and inextricably rooted in the separation of powers"); *accord Loving*

*v. United States*, 517 U.S. 748, 757, 116 S. Ct. 1737, 135 L. Ed. 2d 36 (1996) ("Even when a branch does not arrogate power to itself, moreover, the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties."); *Guy*, 659 A.2d at 783 (the privilege guards the "vital public interest . . . involved in the effective discharge of a governor's constitutional duties").

Our decision to recognize the executive communications privilege as an exemption to the PRA comports with the decisions of our sister states. Every court that has examined the executive communications privilege in light of open government laws has recognized both the privilege and its applicability to open government laws. *Republican Party*, 283 P.3d at 853; *Dann*, 848 N.E.2d at 485; *Guy*, 659 A.2d at 777. The state open government laws at issue in *Republican Party*,[2] *Dann*,[3] and *Guy*[4] shared the PRA's purpose and language. Just as each of

---

[2]In *Republican Party*, the court began by examining several provisions of its state constitution and the Inspection of Public Records Act, N.M. STAT. ANN. §§ 14-2-1 to -12, which is very similar to Washington's constitution and the PRA. *Republican Party*, 283 P.3d at 856, 859. *Compare* N.M. CONST. art. II, § 2 ("All political power is vested in and derived from the people: all government of right originates with the people, is founded upon their will and is instituted solely for their good."), *with* WASH. CONST. art. I, § 1 ("All political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights."); *compare* N.M. Stat. Ann. § 14-2-5 ("a representative government is dependent upon an informed electorate" and "all persons are entitled to the greatest possible information regarding the affairs of government"), *with Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 251, 884 P.2d 592 (1994) ("The stated purpose of the [PRA] is nothing less than the preservation of the most central tenets of representative government."); *compare* N.M. STAT. ANN. § 14-2-1(A) ("Every person has a

10

those courts did, we determine that constitutional concerns must trump the mandate of our open government law, and we reject the idea that this will debilitate our democracy.

> Neither the Supreme Court of the United States nor state supreme courts have been persuaded by arguments similar to those asserted by relator here that the recognition of an executive privilege threatens the viability of our democratic institutions. Rather, to the extent that an executive privilege facilitates candor and open, vigorous debate in the formulation of public policy, it lubricates the decisional process.

*Dann*, 848 N.E.2d at 482.

The Foundation argues that the PRA raises no separation of powers concerns. It asserts that the separation of powers doctrine concerns itself with interbranch conflicts. It maintains that because the PRA empowers the people to demand information from their government, no interbranch conflict occurs and the separation of powers is not implicated. This argument fails for two reasons.

---

right to inspect public records" subject to enumerated exemptions.), *with* RCW 42.56.070 (agencies must make public records available unless exempted by the PRA).

[3]The *Dann* court began its analysis by describing the Ohio PRA, OHIO REV. CODE ANN. § 149.43, and the state's commitment to openness. *Dann*, 848 N.E.2d at 477-78. "It has long been the policy of this state, as reflected in the [PRA] and as acknowledged by this court, that open government serves the public interest and our democratic system." *Id.* at 477. The court noted that the Ohio PRA "'is construed liberally in favor of broad access, and any doubt is resolved in favor of disclosure of public records.'" *Id.* (quoting *Gilbert v. Summit County*, 104 Ohio St. 3d 660, 2004-Ohio-7108, 821 N.E.2d 564, 566); *accord Bainbridge Island Police Guild*, 172 Wn.2d at 408 (we construe the PRA's provisions broadly and exemptions narrowly).

[4]The *Guy* court noted that lawmakers intended the Delaware Freedom of Information Act, DEL. CODE ANN. Title 29, §§ 10001-10006, "to ensure government accountability, inform the electorate and acknowledge that public entities, as instruments of government, should not have the power to decide what is good for the public." 659 A.2d at 780 (citing *Del. Solid Waste Auth. v. News-Journal Co.*, 480 A.2d 628, 631 (Del. 1984)); *accord* RCW 42.56.030.

11

First, the Foundation's reading ignores our separation of powers jurisprudence. While separation of powers issues may sometimes involve conflict between the branches of government, we apply the doctrine by protecting the branches themselves. The communications privilege protects the chief executive's access to candid advice. The PRA implicates this access. The governor may assert the privilege to safeguard the integrity of the executive branch.

Second, the people effectively act as the legislative branch when they pass an initiative. "In approving an initiative measure, the people exercise the same power of sovereignty as the legislature does when it enacts a statute." *Wash. Ass'n for Substance Abuse*, 174 Wn.2d at 654. The same constitutional constraints apply to both an initiative and a legislative enactment. *City of Burien v. Kiga*, 144 Wn.2d 819, 824, 31 P.3d 659 (2001). Essentially, attempts to force disclosure of information through the PRA involve a struggle between the legislative and executive powers. This is exactly the type of interbranch conflict the Foundation claims lies at the heart of the separation of powers doctrine.

The dissent offers three reasons why we should refuse to recognize the gubernatorial communications privilege: precedent from other jurisdictions offers little guidance, the PRA contains other exceptions rendering the gubernatorial communications privilege superfluous, and Washington's history of open government conflicts with recognition of the privilege. We consider each in turn.

12

The dissent first argues that we should reject the executive communications privilege adopted in other jurisdictions based on differences in the powers of Washington's governor and the chief executive officer in those jurisdictions. Dissent at 5-8, 10 n.5. To distinguish Washington's office of governor from the office of president, the dissent cites the president's expansive national security and foreign policy powers. To distinguish Washington's governorship from the governorship in other states, the dissent argues that Washington's office of governor is weaker than the office of governor in other states.

The dissent's attempts to distinguish the governorship from the presidency must fail because the executive privilege does not arise from the scale of the office at issue. It arises from executive power itself. "'It is generally acknowledged that some form of executive privilege is a necessary concomitant to executive power.'" *Dann*, 848 N.E.2d 481 (internal quotation marks omitted) (quoting Vitauts M. Gulbis, Annotation, *Construction and Application, Under State Law, of Doctrine of "Executive Privilege*," 10 A.L.R.4th 355, 357 (1981)). Just as the federal constitution vests executive power in the president, our state constitution vests executive power in the governor. *Compare* U.S. CONST. art. II, § 1, *with* WASH. CONST. art. III, § 2. These vesting clauses provide both offices with the executive communications privilege.

13

Regardless, the dissent is incorrect in asserting that the president's national security and foreign policy powers justify the existence of the presidential communications privilege. The *Nixon* Court signaled that the communications privilege was broader than the president's need for secrecy in foreign policy or military matters, implicitly ruling out those powers as the wellspring of the privilege. *Nixon*, 418 U.S. at 710-11. The gubernatorial communications privilege, like the presidential communications privilege, arises from the need for the chief executive to access differing and possibly unpopular viewpoints in order to formulate policy.[5] Washington's governor requires this access to unpopular viewpoints or candid discussion no less than the president does.

Likewise, the strength or weakness of a governorship has no effect on the existence of the communications privilege. If the division of the executive branch into multiple elected offices distinguishes a strong from a weak governorship, then the dissent correctly identifies the New Jersey governorship as a strong one. N.J.

---

[5]We must disagree with the dissent's contention that the gubernatorial communications privilege simply protects "inflammatory" memoranda or advice that the governor embark upon "illegal courses of action." Dissent at 9-10. First, we cannot say that these statements reflect the due respect we owe to a coordinate branch of government. Second, the gubernatorial communications privilege exists to ensure that the governor has access to "moments of speculation, venturesome alternatives, or retractable words." *Killington, Ltd. v. Lash*, 153 Vt. 628, 637, 572 A.2d 1368 (1990). Effective discharge of the governor's powers requires consideration of all sides of the issues confronting Washington. To do so, the governor must consider bad ideas, or ideas that are unpopular, either with segments of the electorate or the electorate as a whole. It is the governor's access to these types of communications that the privilege protects. *Nixon*, 418 U.S. at 705-08; *Republican Party*, 283 P.3d at 866-68; *Dann*, 848 N.E.2d at 484; *Guy*, 659 A.2d at 783-84; *Hamilton*, 414 A.2d at 922; *Nero*, 386 A.2d at 853.

CONST. art. V, § IV. For that matter, so is the governorship of Delaware. DEL. CONST. art. III, § 9. However, as in Washington, multiple elected offices comprise the executive branches in Ohio and New Mexico. OHIO CONST. art. III, §§ 1, 3; N.M. CONST. art. V, § 1. Each of these states, whether possessing a weak or strong executive, has recognized the executive communications privilege. Again, it is the vesting of executive power within the chief executive officer that creates the privilege, not the scope of the office.[6]

The dissent also claims that the PRA contains exemptions that eliminate the need for an executive privilege. Dissent at 6, 11. The dissent offers no reasoning or evidence that any of these other privileges provides sufficient protection to encourage candid advice. For example, the most topical of these exemptions, the exemption for preliminary drafts and similar materials, ends when the policy is implemented. *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d

---

[6]The dissent argues that *Babets v. Secretary of Executive Office*, 403 Mass. 230, 526 N.E.2d 1261 (1988) demonstrates that some states have rejected the executive communications privilege. The term of executive privilege is often used interchangeably with two different subdoctrines: the deliberative process privilege and the executive communications privilege. *In re Sealed Case*, 326 U.S. App. D.C. 276, 121 F.3d 729, 737-40 (1997). The deliberative process privilege is a common law doctrine that covers general predecisional discussions among governmental officials. *Id.* at 737-38. The executive communications privilege is constitutionally based and it covers communications by and to the governor and certain aides, as discussed below. *Id.* at 738-40. *Babets* involved a request for deliberations occurring as part of an agency decision making process. As such, it considered the deliberative process privilege, not the gubernatorial communications privilege. *Babets*, 403 Mass. at 231-32. While the *Babets* court did consider and reject constitutional arguments, those arguments have no viability in the context of the deliberative process privilege. *See id.* at 233-34. *Babets* is inapposite to the question before us today.

243, 257, 884 P.2d 592 (1994). The communications privilege continues to shield the governor's conversations after this exemption ends, providing additional incentive to provide candid advice, the constitutional rationale for the privilege.

Further, we refuse to displace constitutional protections with statutory ones. For example, fundamental freedoms are given constitutional protections precisely because doing so protects them from mere changes in the law. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638, 63 S. Ct. 1178, 87 L. Ed. 1628 (1943). As discussed above, the separation of powers doctrine plays an important role in preserving individual rights by ensuring strong branches that can effectively check one another. We must guard these structural protections in the same manner that we protect the individual rights themselves. Displacing the constitutional protections with statutory ones is incompatible with this duty.

Finally, the dissent argues that the Washington experience argues against the recognition of the gubernatorial communications privilege. Contrary to the dissent's assertion that "[o]ur state has functioned quite well for approximately 120 years without this privilege," the record reflects that other governors have, in fact, invoked the privilege to shield documents from disclosure. Dissent at 8; CP at 27. Our state has functioned well *with* the existence of the privilege. Further, we note that the experience in other states demonstrates that a gubernatorial

16

communications privilege may coexist with a strong commitment to open government. *See, e.g., Dann*, 848 N.E.2d at 472; *Guy*, 659 A.2d 777.

## C.    The Qualified Gubernatorial Communications Privilege

Every court that has considered the issue has refused to recognize an absolute privilege. *Nixon*, 418 U.S. at 706-07; *Republican Party*, 283 P.3d at 868; *Dann*, 848 N.E.2d at 485; *Guy*, 659 A.2d at 785; *Hamilton*, 414 A.2d at 925; *Nero*, 386 A.2d at 853. Separation of powers concerns recognize the executive's need to keep some conversations confidential. Separation of powers concerns also dictate that the courts may override that confidentiality when it conflicts with "the court's duty to see that justice is done in the cases which come before it." *O'Connor v. Matzdorff*, 76 Wn.2d 589, 600, 458 P.2d 154 (1969); *see Nixon*, 418 U.S. at 711-13. These contrasting constitutional requirements define the limits of the gubernatorial communications privilege in several ways.

Above all, the constitutional communications privilege applies only to communications "'authored'" or "'solicited and received'" by the governor or aides with "'broad and significant responsibility for investigating and formulating the advice to be given'" to the governor. *Judicial Watch, Inc. v. Dep't of Justice*, 361 U.S. App. D.C. 183, 365 F.3d 1108, 1114, 1116 (2004) (quoting *In re Sealed Case*, 326 U.S. App. D.C. 276, 121 F.3d 729, 752 (1997)). The executive communications privilege must extend beyond the governor to serve these

17

purposes. *In re Sealed Case*, 121 F.3d at 747-52; *Judicial Watch*, 365 F.3d at 1114-17. Senior advisors must have the ability to obtain frank advice to help the governor shape policy decisions; extending the privilege away from the governor assures that these advisors will receive candid opinions. *Judicial Watch*, 365 F.3d at 1115. However, "the demands of the privilege become more attenuated the further away the advisors are from the [chief executive] operationally." *Id.* The privilege's justifications fade when dealing with aides unlikely to ever provide policy advice. *Id.* Accordingly, the privilege encompasses not only communications with the governor, but to senior policy advisors as well.

Second, the communication must occur "for the purpose of fostering informed and sound gubernatorial deliberations, policymaking, and decisionmaking." *Dann*, 848 N.E.2d at 485. Like any other privilege, we must limit the gubernatorial communications privilege to its purposes, here ensuring the governor's access to frank advice in order to carry out her constitutional duties. *See Adcox v. Children's Orthopedic Hosp. & Med. Ctr.*, 123 Wn.2d 15, 31, 864 P.2d 921 (1993). The privilege does not exist to shroud all conversations involving the governor in secrecy and place them beyond the reach of public scrutiny. Only those communications made to inform policy choices qualify for the privilege.

Finally, the governor must provide a record that allows the trial court to determine the propriety of any assertion of the privilege. "'[I]t is the judiciary (and

not the executive branch itself) that is the ultimate arbiter of executive privilege.'" *Republican Party*, 283 P.3d at 868 (alteration in original) (quoting *Comm. on Judiciary v. Miers*, 558 F. Supp. 2d 53, 103 (D.D.C. 2008)). Judicial inspection of material to determine the applicability of the privilege intrudes upon the separation of powers by breaching the confidentiality of the communications. *Nixon*, 418 U.S. at 713-14; *Dann*, 848 N.E.2d at 486; *Hamilton*, 414 A.2d at 926. Respect for a coordinate branch of government therefore requires us to provide some deference to a governor's decision that material falls within the ambit of executive privilege. *Dann*, 848 N.E.2d at 486. But the judicial branch has the ultimate responsibility to determine the validity of a privilege claim. To assist the courts in making this determination, the governor must provide a privilege log listing the documents involved, the author and recipient, and a general description of the subject matter such that the court can evaluate the propriety of the governor's claims. If the governor provides this log, the courts must treat the communications as presumptively privileged.

Because the privilege is qualified, the requesting party may attempt to overcome the presumption by showing a particularized need for the materials. If the party makes this showing, the trial court must evaluate the documents in camera. The trial court must determine whether the requesting party's need for the material outweighs the public interests served by protecting the chief executive's

access to candid advice for purposes of formulating policy; if so, it must release the documents. The federal courts have recognized that the demands of both criminal and civil trials may serve to overcome the privilege. *Nixon*, 418 U.S. at 712-13; *Sun Oil Co. v. United States*, 514 F.2d 1020, 1024 (Ct. Cl. 1975); *Dellums v. Powell*, 182 U.S. App. D.C. 244, 561 F.2d 242, 247 (1977). Other state courts have suggested that "authorized legislative committee[s] or grand jur[ies]" may also be able to make the necessary showing. *Dann*, 848 N.E.2d at 486. We express no opinion on whether these or any other justifications would serve to overcome the presumption of privilege for the simple reason that the Foundation refused to make any attempt to overcome the presumption by refusing to demonstrate a specific need for the documents.[7]

The dissent urges us to adopt a modified version of the *Nixon* test. The dissent claims that we should follow the lead of the New Mexico Supreme Court and eliminate *Nixon*'s requirement that a requesting party overcome any assertion of privilege with a showing of particularized need. This test is inconsistent with the constitutional underpinnings of the gubernatorial communications privilege. Separation of powers considerations require us to abstain from examining material the governor has determined is privileged unless the requesting party demonstrates

---

[7]Chief Justice Madsen's concurrence advocates our including more guidance on the executive privilege we recognize. The parties have not presented argument on the contours. Future cases, if any, will provide the appropriate opportunities. We should not make these decisions in a vacuum.

some particularized need for the material, for judicial examination necessarily intrudes into the executive branch's need for confidentiality. *Dann*, 848 N.E.2d at 486. The fact that the requesting party is seeking the material under the PRA is irrelevant to this constitutional analysis. *Guy*, 659 A.2d at 785; *Killington, Ltd. v. Lash*, 153 Vt. 628, 635, 572 A.2d 1368 (1990). Holding otherwise elevates an exercise of the legislative power above the constitution, which is anathema to our system of law. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178, 2 L. Ed 60 (1803).

D.    The Gubernatorial Communications Privilege Applied

Having defined the boundaries of the gubernatorial communications privilege, we must now apply them to the communications at issue in the Foundation's PRA request. Our review of the record shows the gubernatorial communications privilege applies to the materials the Foundation seeks.[8]

The governor provided the Foundation, and the trial court, with a privilege log and a letter explaining the log. The letter and log identify the documents at issue, the author and recipient of each document, and their subject matter in terms

---

[8]This case concerns an assertion of executive privilege made by a sitting governor in response to a PRA request made during her term of office. The assertion of privilege led to a suit, trial, and appeal for which we heard argument during that same term of office. As the dissent notes, some question exists about the ability of a former governor to assert the gubernatorial communications privilege. Dissent at 18-19. However, the facts of this case do not offer the chance to resolve this question. Consequently, we defer answering the question of a former governor's authority to assert the gubernatorial communications privilege until the appropriate case presents us with the opportunity to do so.

21

sufficient to determine the applicability of the privilege claims. Four of the documents were directed to the governor herself. One of these is the redacted document; apparently the governor chose to waive privilege for all but her handwritten comments on a decision document. The governor authored the entirety of one of the other documents. The final document consists of an e-mail written by the governor's executive assistant to the governor's executive policy staff. This document also incorporated questions the governor wrote and directed her assistant to forward on to the policy staff and some of their responses to these questions. The letter from the governor's counsel states that the governor asserted privilege to assist in the fulfillment of her constitutional duties. The gubernatorial communications privilege we have described above covers these documents. The communications were communications authored or solicited and received by the governor or senior advisors who had broad discretion over policy matters. They concerned policy matters. The governor's assertion of privilege therefore creates a presumption of privilege, allowing the governor to withhold the documents absent a sufficient showing by the Foundation.[9]

---

[9]The governor's chief counsel made the assertion of privilege on behalf of the governor, both in response to the Foundation's PRA request and then under penalty of perjury during the trial below. While the privilege belongs to the governor, dissent at 17-18, we cannot say that this is not an assertion of privilege by the governor. An appropriate official has invoked the privilege on behalf of the governor. *See New England Coal. for Energy Efficiency & Env't v. Office of Governor*, 164 Vt. 337, 344-45, 670 A.2d 815 (1995).

The Foundation refused to make any type of showing of need that would require the court to determine whether its interest in obtaining the documents outweighed the public interest in the governor's access to candid advice. Accordingly, the trial court did not err in determining that the Foundation could not compel the governor to disclose the documents. Because the Foundation did not prevail, here or at trial, we affirm the trial court's decision to deny the Foundation attorney fees under RCW 42.56.550(4).

## V.    CONCLUSION

The people delegated supreme executive power to the governor when they ratified the constitution. The gubernatorial communications privilege, delegated along with supreme executive power and vested in the governorship, cabins the right to demand information through open government laws. *Republican Party*, 283 P.3d at 856. The PRA cannot override this constitutional delegation of power; any such attempt must come through constitutional amendment. Like the trial court below, we conclude that the governor may invoke the gubernatorial communications privilege in response to a PRA request.

We affirm.

Fairhurst, J.

WE CONCUR:

Wiggins, J.

Charles, J.P.T.

Owens, J.

Gonzáles, J.

No. 86384-9

MADSEN, C.J. (concurring)—Washington has long enjoyed a tradition of open government and public disclosure. In light of this commitment, I agree with the concurrence's narrow interpretation of the *Nixon*[1] test to better reflect the interests of the people of this state. However, I write separately because neither the majority opinion nor Justice C. Johnson's concurring opinion clearly identifies limitations upon the executive privilege and the parameters for in camera review of requested communications. Without clearly articulated guidance, there is the potential for inconsistent and overly broad application of the privilege. Therefore, I concur to urge clarification on this point.

## Discussion

The majority opinion only vaguely defines the scope of the executive privilege. In discussing the privilege, the majority broadly refers to the chief executive's need for candid advice to carry out his or her constitutional duties. Majority at 9, 18. Although the majority acknowledges this privilege does not protect all conversations involving the governor, the majority unhelpfully states that only communications made to inform policy choices are protected. *Id.* at 18. However, one could easily interpret most, if not all communications as being encompassed in this amorphous standard.

---

[1] *United States v. Nixon*, 418 U.S. 683, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974).

Furthermore, the majority provides limited guidance to courts conducting in camera review. While discussing this third step in the *Nixon* analysis, the majority opinion states that the trial court "must determine whether the requesting party's need for the material outweighs the public interests served by protecting the chief executive's access to candid advice for purposes of formulating policy." *Id.* at 19-20. In so doing, the majority declines to further refine this test because Freedom Foundation did not attempt any showing of need to overcome the presumption of privilege. I agree with the concurrence that we should modify the *Nixon* analysis to remove the need requirement. Concurrence at 6. As the concurrence states, such a heavy burden on the requester at the state level is not warranted where the concerns that face the president are not faced by the governor.

Although the concurrence discusses in camera review in more depth than the majority, adequate guidance is still not provided to the trial court regarding the scope of such review, including the extent to which documents are protected. For example, the concurrence advocates for an approach resembling our existing review process under the Public Records Act (PRA), chapter 42.56 RCW, comparing the deliberative process exemption. While it is attractive to draw parallels to the in camera review procedures undertaken in the PRA, the executive privilege exemption requires a narrower test than the deliberative process exemption. This is because the deliberative process exemption only protects policies or recommendations until implementation. *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 257, 884 P.2d 592 (1994) (citing

2

*Brouillet v. Cowles Publ'g Co.*, 114 Wn.2d 788, 799-800, 791 P.2d 526 (1990)). In contrast, the executive privilege exemption potentially protects governor opinions in perpetuity, as acknowledged by the concurrence. Concurrence at 5.

To avoid the risk of an overly broad application of the privilege, we should explicitly limit this constitutionally derived privilege to only communications involving the express constitutional powers and duties of the governor. Specifically, our governor has the powers to pardon, veto, and remit fines and forfeitures, and the duty to be commander-in-chief of the military in the state. CONST. art. III, §§ 8, 9, 11, 12. If these powers or duties are not implicated in a communication, then the governor should look to the PRA for protections from disclosure.

At the very least, we should provide clear and narrow parameters regarding the content of privileged communications. Otherwise, there is the potential for almost all communications to be considered privileged in the guise of supporting the governor's access to candid advice. This could also lead courts to inconsistent results during in camera review. As the Ohio Supreme Court noted in *State ex rel. Dann v. Taft*, 110 Ohio St. 3d 252, 260, 2006-Ohio-1825, 853 N.E.2d 263, all communications could be argued to collectively inform a governor, but that such an application is overbroad.

I would also advocate that entire documents not be withheld if the privilege applies; instead, those portions that are privileged should be redacted. I believe it is crucial to make these distinctions clear, lest it appear that all communications fall under the exemption.

3

While I am mindful of the position that the governor has and the important decisions faced by the office, we must not ignore Washington's commitment to public disclosure. The governor's decisions should not be entirely shielded from public view when the position naturally faces lobbying and other potential influences of which the public may need to be aware. Accordingly, I agree with Justice C. Johnson's concurrence to the extent that he advocates limitations on the privilege and proposes eliminating the *Nixon* showing of need requirement for in camera review. However, I believe more clarity is necessary to define the extent of the privilege so as to prevent inconsistent and potentially broad application of the privilege by courts conducting in camera review.

Madsen, C.J.

No. 86384-9

C. JOHNSON, J. (concurring)—I concur with the majority but write separately to express my concerns with the majority's adoption of the three-part *Nixon*[1] analysis. I agree with the majority that under our state constitution an executive communications privilege exists somewhat analogous to that under the federal constitution. It does not then follow, though, that we must adopt the federal approach applicable to the exercise of presidential executive privilege. Our commitment to open government, the differences between gubernatorial and presidential power, and the excessive burdens to compel disclosure under the federal analysis warrant a more realistic analysis. We should adopt an approach more reflective of the principles of state government and consistent with our established framework controlling analysis of exemptions under the Public Records Act (PRA), chapter 42.56 RCW.

---

[1] *United States v. Nixon*, 418 U.S. 683, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974).

Washington's history illustrates a more robust commitment toward public disclosure than our federal government, and the PRA is the most forceful example of this commitment. Although we have previously noted that the federal Freedom of Information Act (FOIA), 5 U.S.C. § 552, is an appropriate comparison when discussing our own PRA, the two acts are by no means identical. *See Hearst Corp. v. Hoppe*, 90 Wn.2d 123, 129, 580 P.2d 246 (1978) (noting that the PRA is more severe than FOIA in several areas, such as the awarding of attorney fees). Just as the United States Supreme Court recognized that presidential executive privilege "must be considered in light of our historic commitment to the rule of law," *Nixon*, 418 U.S. at 708, so must gubernatorial privilege be considered in light of our own state's historic commitment to public disclosure and open government.

The office of governor is not equivalent to the office of the president of the United States, either in the scope of power or the ramifications that flow from disclosure of confidential information. The dissent wrongly concludes that because the governor is not pressed by the weighty concerns of national security, gubernatorial executive privilege does not exist. Dissent at 6. The scope of an executive's power is irrelevant in regard to the *existence* of the executive privilege because executive privilege is derived from the structure of the state and federal constitutions. But the scope is quite relevant in regard to the degree of *deference*

2

afforded that privilege. Our governor is not pressed with comparable decisions to those of the president, and the test for gubernatorial privilege should reflect this lesser need for confidentiality.

Finally, the *Nixon* analysis is contrary to common sense. By leaving the inquiry into whether the documents are protected by executive privilege until the final, third step, the requesting party may be forced to provide a particularized need for documents that may not even be privileged at all. In fact, this occurred, after lengthy and costly litigation, in *Dann* II, a case that the majority cites approvingly but neglects to note the final outcome. *State ex rel. Dann v. Taft (Dann* II*)*, 110 Ohio St. 3d 252, 2006-Ohio-1825, 853 N.E.2d 263, 272 (holding that executive privilege did not apply to nearly all material requested under state PRA). The *Nixon* analysis's grant of extreme deference to the executive's assertion of executive privilege, and the heavy burden it places on the requestor by requiring a showing of particularized need even before the privilege is established, are simply not warranted at the state level.

The governor enjoys an executive communications privilege, but we are not bound to uncritically follow the lead of several of our sister states and the federal courts in adopting the *Nixon* analysis. A rule that better balances both the constitutional separation of powers and the obligations of an open government

3

should be adopted. The PRA provides a helpful model upon which to base a more narrowly tailored rule in the examination of executive privilege at the state level. While the PRA is statutory, it cannot bind our analysis of a constitutional privilege. But we should not be so quick to discard the experience our courts have acquired in reviewing PRA requests.

The approach should be that after the governor asserts an executive privilege and the requestor, in turn, files a claim for disclosure, the court reviews the documents in camera to determine whether the privilege applies. If the court finds that the executive privilege does not apply, the documents are released. Our courts are already familiar with the in camera review process mandated by the PRA to determine whether an exemption applies. RCW 42.56.550(3). While not advanced by the parties, the analysis for executive privilege should resemble our existing review process under the PRA. For example, in reviewing whether documents are exempt as a deliberative process under RCW 42.56.280, the court conducts an in camera review of the documents to determine whether the agency has met its burden of proving that the documents have met the four required criteria. *Progressive Animal Welfare Soc'y v. Univ. of Wash.*, 125 Wn.2d 243, 256, 884 P.2d 592 (1994) (*PAWS*). In camera review is, similarly, warranted to establish the judicially created PRA exemption for attorney work product. *Soter v. Cowles*

*Publ'g Co.,* 162 Wn.2d 716, 744, 174 P.3d 60 (2007). As under the PRA, under our approach to executive privilege, the burden would rest with the governor to establish an exemption (here, executive communications privilege) to the normal disclosure requirements. *Cf.* RCW 42.56.550(1) (placing the burden of proof on the agency to establish that refusal to permit public inspection). This analysis would not only be consistent with the spirit of the PRA but would also narrow the executive communications privilege. A narrow approach to this privilege is consistent with our existing cases. *See PAWS,* 125 Wn.2d at 251. Likewise, a narrow approach should look to limit the duration of a specific assertion of executive privilege, perhaps until the term of office ends or until the need for confidentiality abates.

The *Nixon* analysis is broader in scope and more deferential to the executive than any existing exemption under the PRA. Our former governor did not assert that she is exempt from the PRA, yet the majority's adoption of the federal approach has the potential to functionally isolate the governor and the governor's staff from the disclosure mandates of the PRA. If the governor, in fact, does seek such a broad and deferential executive communications privilege, that should be for the legislature to create, not this court.

In the present case, our former governor responded to Freedom Foundation's PRA request by providing all but five documents and a partially redacted sixth. On these documents alone does she assert an executive communications privilege? Freedom Foundation should not be further required to provide a particularized need for documents whose content it cannot possibly determine unless the documents are disclosed. The lower court should review in camera whether the former governor has met her burden in establishing a communications privilege over these documents, and if she has not, the documents should be released in accord with our state's commitment to transparency and open government.

7

No. 86384-9

J.M. JOHNSON, J. (dissenting)—Today the majority amends our constitution and laws (Initiative 276) to grant a former governor power to hide from the citizens office records relating to major (and often expensive) deals made by the governor. The current and recently elected governor does not support nor advocate this protection, but the "majority" marches on, with neither constitutional nor legal support—save one case involving the discovery of the files of Richard Nixon, when impeached as United States president.

It was once wisely observed that "[a] popular Government, without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance: And a people who mean to be their own Governors, must arm themselves with the power which knowledge gives." Letter from James

Madison to W.T. Barry (Aug. 4, 1822), *in* 9 THE WRITINGS OF JAMES MADISON 103 (1910).

The majority ignores our state's constitution, statutes, and populist tradition and does great damage to over 120 years of open government in Washington, as enforced by Initiative 276, as well as to the limits our constitutional framers intentionally placed on executive power. It is not alarmist to say that this decision could place a shroud of secrecy over much government conduct, unless changed by a wiser court, electorate, or legislature.

Our constitution does not mandate nor does it allow this result. Unlike the United States president, commander-in-chief of the nation's military, Washington's governor does not need the immense power of a gubernatorial communications privilege in order to maintain the proper balance between the branches required by the separation of powers doctrine or to protect his or her decisions from the public eye. Washington State has no stealth bombers, nuclear weapons, or immediate plans for war. Accordingly, I dissent.

ANALYSIS

I.    This   Court   Does   Not   Need   To   Create   a   Gubernatorial
      Communications Privilege in Order To Afford the Executive Branch
      Limited Protection Required by Separation of Powers

      a.    Separation of Powers

Our constitution does not contain a formal separation of powers
clause.   However, this court has recognized that the division of our state
government into different branches gives rise to a "'vital separation of
powers doctrine.'" *Brown v. Owen*, 165 Wn.2d 706, 718, 206 P.3d 310
(2009) (quoting *Carrick v. Locke*, 125 Wn.2d 129, 135, 882 P.2d 173
(1994)).   We test for separation of powers violations by determining
"'whether the activity of one branch threatens the independence or integrity
or invades the prerogatives of another.'"   *Id.* (internal quotation marks
omitted) (quoting *Carrick*, 125 Wn.2d at 135).   The "'fundamental functions
of each branch [must] remain inviolate.'"   *Id.*

      For example, we will not overturn the president of the senate's ruling
on a point of order or compel the president of the senate to forward a bill to
the house because to do so would impermissibly interfere with one of the
legislature's fundamental functions.   *Id.* at 719-22.   For the same reason, the
legislature may not adopt procedural rules that conflict with our court rules.

3

*E.g., Putman v. Wenatchee Valley Med. Ctr.*, 166 Wn.2d 974, 984-85, 216 P.3d 374 (2009). Similarly, we will not review a governor's decision to call a special session of the legislature because that decision is "the exclusive province of the governor, under the constitution." *State v. Fair*, 35 Wash. 127, 131, 76 P. 731 (1904).

That said, the three branches are not "hermetically sealed off from one another." *Carrick*, 125 Wn.2d at 135. In fact, "[o]ur system of government allows each branch to exercise some control over the others . . . ." *Brown*, 165 Wn.2d at 720. "The different branches must remain partially intertwined if for no other reason than to maintain an effective system of checks and balances, as well as an effective government." *Carrick*, 125 Wn.2d at 135 (citing *In re Juvenile Director*, 87 Wn.2d 232, 239-40, 552 P.2d 163 (1976)). Like the framers of the United States Constitution, our framers were concerned with creating a government that is "both effective and accountable." *See Loving v. United States*, 517 U.S. 748, 757, 116 S. Ct. 1737, 135 L. Ed. 2d 36 (1996). As I will further explain below, the Public Records Act (PRA), chapter 42.56 RCW, serves as a tool of accountability that does not intrude on the fundamental functions of the executive found in our state constitution. Through Amendments 8 and 9 of

4

the state constitution, the people (voters) took power to make or void law and remove elected officials, all *without* the governor having any role.

b.    Candid Advice

I agree with the majority that sometimes the governor "must have access to candid advice in order to explore policy alternatives and reach appropriate decisions." Majority at 9. I vehemently disagree, however, with the majority's conclusory assertion that our governor must enjoy the same privilege as the president of the United States in order to receive that advice.[1] It is possible to analogize between the two offices in the sense that both are the head of their respective executive branches, but when comparing their individual responsibilities, it becomes increasingly difficult to justify the adoption of such a powerful privilege at the state level. The governor does not need as much decisional "elbow room" as the president.

The president is granted exceptional powers and responsibilities in article II of the United States Constitution. The main case upon which the majority relies, *United States v. Nixon*, directly acknowledged that the

---

[1] Notably, a "gubernatorial communications privilege" clause is nowhere to be found in our state constitution. Presumably, our framers did not think our governor needed such a powerful privilege in order to receive the candid advice necessary to exercise his or her constitutional duties.

5

privilege afforded the president owed itself to "the singularly unique role under art. II of a President's communications and activities, related to the performance of duties under that Article." 418 U.S. 683, 715, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974); *see also In re Sealed Case*, 326 U.S. App. D.C. 276, 121 F.3d 729, 749 (1997) (noting that the president occupies a truly unique position in the separation of powers analysis). Sure, the governor has some dealings with other governments and is the nominal commander-in-chief of the state National Guard, but those responsibilities are wholly different from overseeing the Central Intelligence Agency (CIA) conducting active military missions overseas or engaging in antinuclear proliferation negotiations with hostile foreign powers. There is little, if anything, that the governor handles that a little more public scrutiny could drastically harm; no death of American citizens or international conflict will result. *See Nixon*, 418 U.S. at 710, 715. The scale of the privilege should reflect the difference in scale between the offices. The multitude of exemptions available under the PRA sufficiently protect the governor's access to candid advice. *See, e.g.*, RCW 42.56.280 (exempting the preliminary drafts, notes, recommendations, and intra-agency memorandums in which opinions are expressed or policies formulated or recommended).

Furthermore, secrecy may be mundane at the federal level, but it is not in Washington. The Supreme Court in *Nixon* acknowledged that "[t]here is nothing novel about [federal] governmental confidentiality" and cited in support the fact that the Constitutional Convention of 1787 was conducted in complete privacy. *Nixon*, 418 U.S. at 705 n.15. In contrast, Washington's convention was conducted under the watchful eye of the public. *Yelle v. Bishop*, 55 Wn.2d 286, 292, 347 P.2d 1081 (1959) (noting the presence of newspapers at the convention). The very first section of the very first article in our state constitution establishes that the government, including the governor, derives its power from the consent of the people. WASH. CONST. art. I, § 1 ("All political power is inherent in the people, and governments derive their just powers from the consent of the governed, and are established to protect and maintain individual rights."). The framers undoubtedly intended for that consent to be informed. Accordingly, the PRA is just a statutory acknowledgement of this long tradition and history. It was not groundbreaking for our state when the voters declared in the PRA that

> [t]he people of this state do not yield their sovereignty to the agencies that serve them. The people, in delegating authority, do not give their public servants the right to decide what is good for the people to know and what is not good for

them to know. The people insist on remaining informed so that they may maintain control over the instruments that they have created.

RCW 42.56.030. Open government is one of our state's clearest and most fundamental guiding principles.

Contrary to the majority's contention, failing to recognize a gubernatorial communications privilege would not "subvert the integrity of the governor's decision making process" and "damag[e] the functionality of the executive branch." Majority at 9. Our state has functioned quite well for over 100 years without this privilege.[2] It is instructive that the current governor does not think the privilege will be essential to the "functionality" of his administration.[3]

---

[2] The majority cites to a declaration from the governor's counsel, Narda Pierce, to imply that the governors in this state have a long and established history of asserting executive privilege. *See* majority at 16 (citing to Clerk's Papers (CP) at 27). This declaration contains a conclusory statement that "previous governors . . . [have] recognized" the privilege citing to only one other, very recent, example of a governor who asserted the privilege: Gary Locke. CP at 27 (Decl. Pierce ¶ 27). Notably, Ms. Pierce was "Solicitor General in the Attorney General's Office from 1993-2005 and in that role interacted with and provided advice to . . . [Gary Locke] and his staff." *Id.* The majority's citation does not refute my point.

[3] Governor Inslee said that he would not invoke the executive communications privilege that Governor Gregoire has used to block the release of the records in this case. Brad Shannon, *McKenna, Inslee Seek Open Records*, THE OLYMPIAN, June 17, 2012, at A3, A12.

8

Moreover, the statements in *Nixon*, 418 U.S. at 686, the majority cites in support of its argument make more sense within the specific context of that case. Secretly recorded conversations were at issue in *Nixon*.[4] Here, we deal not with secretly recorded conversations but with written documents, i.e., reflective communications. If we refused to acknowledge a privilege in this case, it would likely mean that the governor and his or her aides would have to be more thoughtful and reflective in their circulated written communications. One would hope that the officials in question are already not offering foolish advice and are already refraining from suggesting actions that would violate statutes or regulations. In other words, the predominant effect would be on tone not candor. "Could it be that a governor might be more inclined to take good advice if he [or she] knows that the public will one day see that he [or she] was offered it?" *State ex rel. Dann v. Taft*, 109 Ohio St. 3d. 364, 389, 2006-Ohio-1825, 848 N.E.2d 472 (2006) (Pfeifer, J., dissenting).

---

[4] Washington law makes it illegal to record a conversation without mutual consent. RCW 9.73.030.

c.     Washington's Constitution and Laws

Washington's constitution and laws demonstrate a strong tradition of open government that should not be overridden out of concern that the governor or his or her aids might have to be a little less inflammatory in their memoranda or might have to stop suggesting illegal courses of action. The governor offers no concrete evidence that the executive does not function effectively because of the lack of a gubernatorial communications privilege. The majority is exempting the governor from one of this state's clearest guiding principles—open government—on the basis of vague conclusions about human behavior.[5] It would not be unprecedented for our state to decline to give our governor such a powerful privilege.

In a case that the majority ignores, the Massachusetts Supreme Judicial Court declined to recognize an executive privilege. *Babets vs. Sec'y of Human Servs.*, 403 Mass. 230, 526 N.E.2d 1261 (1988). The court held that the "doctrine of separation of powers does not require recognition" of

---

[5] Additionally, the majority fails to recognize that the governorship is weaker in this state than in some of the other states that have adopted an executive communications privilege. For example, in New Jersey, a state the majority points to as being a "sister," the framers had as a "primary objective" the "creation of a strong executive." Majority at 10; *Nero v. Hyland*, 76 N.J. 213, 386 A.2d 846, 853 (1978). In contrast, under article III, section 1 the executive power in this state is fragmented into eight separate elected offices: governor, lieutenant governor, secretary of state, treasurer, auditor, attorney general, superintendent of public instruction, and commissioner of public lands.

the executive privilege. *Id.* at 1263. The court additionally held that its "declining to recognize the asserted privilege does not constitute the exercise of nonjudicial power or interfere with the Executive's power." *Id.* The court found it significant that the government "failed to demonstrate that the Executive does not function effectively because of the lack" of the privilege. *Id.* The court reasoned that if "the framers of our government's structure intended to recognize in [Massachusetts's] [c]onstitution an executive privilege, it is reasonable to expect that they would expressly have created one." *Id.* The court concluded that having a more thorough "public debate about the meaning and purposes of executive policy may result in better policymaking." *Id.* at 1266. Like the *Babets* court, and under the same rationale as the *Babets* court, we should decline to grant this privilege.[6]

Contrary to the majority's implication, to deny the governor the requested privilege would not open the innerworkings of the governor's office to one and all. The PRA currently contains hundreds of exemptions that could potentially apply to public records in the governor's possession.

---

[6] The majority ignores the broader nature of the Massachusetts Supreme Judicial Court's analysis when it concludes that *Babets* is "inapposite." Majority at 15 n.6. Yes, the deliberative process privilege was what was specifically at issue in *Babets*, but the court's analysis is applicable and persuasive beyond that context.

11

For example, the deliberative process exemption protects "[p]reliminary drafts, notes, recommendations, and intra-agency memorandums in which opinions are expressed or policies formulated or recommended . . . ." RCW 42.56.280. Other examples include exemptions for attorney-client communications, attorney work product, records related to state security and the prevention of terrorism, as well as records related to ongoing investigations. RCW 42.56.240 (investigative records); RCW 42.56.420 (records relating to state security and the prevention of terrorism). In sum, there are sufficient statutory protections for sensitive information in the governor's possession.[7] Our constitution does not mandate the majority's recognition of a gubernatorial communications privilege.[8]

---

[7] Additionally, the majority's conclusory argument that a gubernatorial communications privilege is an exemption to the PRA is disingenuous. Majority at 10. In reality, the majority is ruling the PRA unconstitutional as it is applied to the governor without expressly doing so.

[8] Ironically, the majority instructs the people of this state that they must amend the constitution in order to overcome a privilege nowhere found in our state constitution, unnecessary to ensuring the governor's receipt of candid advice, and contrary to the populist traditions and history of this state.

II.    If Our Constitution Did Require the Recognition of a Gubernatorial Communications Privilege, then this Court Should Have Adopted a Test That Does a Better Job of Limiting the Privilege than the *Nixon* Test

a.    The *Nixon* Three-Step Test

If our constitution required the recognition of this privilege, then the majority should have adopted a better test. The majority's adoption of the *Nixon* three-step is like a surgeon using a hatchet when a scalpel is clearly more appropriate.[9] Such a powerful privilege is not necessary to protect the independence, integrity, or prerogatives of our state's executive branch.

The majority describes the *Nixon* test and attempts to apply it but fails to adequately justify why our state should adopt it. The majority simply opines that the trial court used the *Nixon* test because the Freedom Foundation failed to provide a satisfactory alternative test and then summarily applies the *Nixon* test as our law.[10] Majority at 4-5. As noted above, the majority fails to consider the obvious differences between a governor and a president or our state's unique constitution, history, and traditions. If our constitution required recognition of this privilege, a more limited test would be better suited to our state.

---

[9] This careless surgeon has killed the patient (open government).
[10] The Freedom Foundation advocated applying the procedural rules of the PRA.

13

The majority could improve upon the *Nixon* test, which was formulated in the context of a discovery dispute, in a number of ways. For example, one of the cases the majority cites to supports recognition of a gubernatorial communications privilege and applies a test that improves *Nixon*, in favor of disclosure, by not requiring a showing of particularized need or a balancing of interests. *See Republican Party of N.M. v. N.M. Taxation & Revenue Dept.*, 2012-NMSC-026, 283 P.3d 853. In *Republican Party of New Mexico*, the Republican Party and the director of a voting organization brought an action to enforce a public records request under the New Mexico Inspection of Public Records Act (IPRA) against the Taxation and Revenue Department and Motor Vehicle Division. *Id.* at 856-57. Both agencies responded, disclosing some of the requested documents but redacting some of the information pursuant to, among other claims, a claim of executive privilege. *Id.* at 857. The New Mexico court recognized a gubernatorial communications privilege analogous to that afforded the president. *Id.* at 868. The court then laid out a test that adapted the *Nixon* test to better align with the principles of open government found in that state (similar to, but not as strong as those found in Washington).

14

The court said that because the IPRA does not require a requesting party to "assert any particular need for disclosure" courts should not "balance the competing needs of the executive and the party seeking disclosure." *Id.* at 870. Instead, the courts should "independently determine whether the documents at issue are in fact covered by the privilege . . . ." *Id.* The court said that "[w]here appropriate, courts should conduct an in camera review of the documents at issue as part of their evaluation of privilege." *Id.* In other words, in New Mexico, a person seeking to enforce a public records request does not have to show a particularized need, and the court will evaluate the governor's claim of executive privilege independently, more readily using in camera review, without balancing any purported interests. *Republican Party of New Mexico* eliminates steps two and three of the *Nixon* test and focuses much less deferentially on step 1: whether the privilege is properly asserted in the first place. Given the strength of our state's PRA and the obvious differences between a governor and the president, it is not readily apparent why the majority did not adopt the test laid out in *Republican Party of New Mexico*.

As I have already discussed *supra*, the majority disregards the dramatic differences in the respective powers and responsibilities of the

15

governor and the president. Our superior court judges are not going to be asked to look at plans for clandestine CIA operations or sensitive foreign policy strategies. Additionally, we have no reason to believe that the judges called upon to review these documents in camera will inevitably and invariably disclose the contents of what they have reviewed. All evidence is to the contrary. Adopting a test for PRA requests, like that used in New Mexico, would be one way for the majority to create its desired privilege while better preserving Washington's preference for open government. Given the difference between the president and the governor, the governor's privilege does not have to be as impenetrable. Even states that have fully adopted all three *Nixon* steps in every context acknowledge that in camera review would only have a minimal effect on candor, if any at all.[11] *See Hamilton v. Verdow*, 287 Md. 544, 566, 414 A.2d 914 (1980).

Providing for in camera review of this nature would be an appropriately limited check and balance on such a powerful executive privilege. It is the least the majority could have done after constructing this

---

[11] Allowing for "limited intrusion . . . in light of . . . substantial public interests" would not be unprecedented. *See Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 451-53, 97 S. Ct. 2777, 53 L. Ed. 2d 867 (1977) (allowing a government archivist to screen communications a former president has identified as being covered by the executive communications privilege).

large wall of secrecy around the executive. Requiring a showing of particularized need "before a judicial determination is made as to whether the material is sufficiently related to the gubernatorial decisionmaking process to qualify for confidential treatment . . . , the majority makes it possible for the governor to withhold documents on the basis of a privilege that is not applicable in the first place." *Dann*, 109 Ohio St. 3d at 382 (Resnick, J., dissenting). It is possible to be respectful of our separation of powers doctrine without being as deferential as the majority. The governor of Washington emerges from this case with a privilege found nowhere in our constitution and grossly out of proportion with his or her responsibilities.

### b. Muddling the *Nixon* Test

In highlighting many of the limitations *Nixon* and its progeny have placed on the executive communications privilege, the majority fails to acknowledge additional limitations that surely would apply to a gubernatorial privilege.[12] For example, early in its opinion when describing

---

[12] Additionally, the majority does not reach the third *Nixon* step because Freedom Foundation declined to demonstrate a specific need, but when the balancing of the requester's need and the governor's interest is conducted, we should require the governor to prove by clear, cogent, and convincing evidence that the requested disclosure will interfere with the performance of the governor's constitutional function. *See* Lee Marchisio, *Executive Privilege Under Washington's Separation of Powers Doctrine*, 87 WASH. L. REV. 813, 842-43 (2012).

17

the *Nixon* test the majority says that the "governor or the governor's representative creates the presumption that a document is privileged by stating that he or she has reviewed the document and 'determined that it falls within the privilege . . . .'" Majority at 3 (quoting Clerk's Papers at 237).[13]  Later in the opinion, the majority states that it is the "governor [who] must provide a privilege log . . . ." *Id.* at 19.  I assume that the majority is fully behind its latter statement: it is the governor who bears the responsibility of creating the presumption.   This task should not be performed by the governor's representative without direct and specific instruction from the governor.  Some states require the governor to attest in a sworn affidavit to the fact that he or she has (1) reviewed the documents in question personally and (2) that the document are covered by the privilege. *See, e.g., Doe v. Alaska Superior Court*, 721 P.2d 617, 626 (Alaska 1986). At the very least, requiring an affidavit would be appropriate.  This is a task that may not be performed by an advisor, regardless of how close he or she is to the governor.  The privilege is the governor's.

---

[13] It is not clear why the majority chose to quote the superior court order when outlining the contours of the *Nixon* test instead of citing directly to *Nixon*, 418 U.S. 683.  Direct reference to *Nixon* might have prevented this confusion.

Additionally, it is unclear from the majority's opinion whether or not the ability to assert the privilege passes to the incumbent governor or stays with the governor that created the document in question. There is case law supporting the notion that the privilege belongs predominantly to the incumbent. *See, e.g., Guy v. Judicial Nominating Comm'n*, 659 A.2d 777, 786 (Del. Super. Ct. 1995) ("The privilege belongs to the Chief Executive and may be waived only by an incumbent of that office."); *Nixon v. Sampson*, 389 F. Supp. 107, 151 (D.C. Cir. 1975) ("[I]t is the incumbent President, not the former President, who bears the legal and political responsibility for either asserting or waiving the privilege."). Additional authority supports the idea that the former executive's ability to assert privilege is eroded with time. *See, e.g., Judicial Watch, Inc. v. Dep't of Justice*, 361 U.S. App. D.C. 183, 365 F.3d 1108, 1124 (2004) ("[T]he 'expectation of the confidentiality of executive communications [ ] has always been limited and subject to erosion over time after an administration leaves office.'") (alteration in original) (quoting *Nixon v. Admin. of Gen. Servs.*, 433 U.S. 425, 451, 97 S. Ct. 2777, 53 L. Ed. 2d 867 (1977)); *Dellums v. Powell*, 182 U.S. App. D.C. 244, 561 F.2d 242, 245 (1977) ("Assuming arguendo a former President may present a claim of presidential privilege,

19

we agree with the District Court both that it is entitled to lesser weight than that assigned the privilege asserted by an incumbent President . . . ."). Given the differences between the president and our governor, if a document was created by a former governor and never identified as privileged by that governor, it should be completely up to the incumbent governor to decide whether or not it is privileged.[14]

c.    The Privilege Log

The majority requires the governor to "provide a privilege log listing the documents involved, the author and recipient, and a general description of the subject matter" that gives enough detail to allow a court to "evaluate the propriety of the governor's claims" before the governor is entitled to the presumption. Majority at 19. It is not entirely clear from the majority's opinion where the "log" the majority is referring to is located in the clerk's papers. If it is the spreadsheet found on page 124 of the clerk's papers, the log is grossly insufficient.

---

[14] Additionally, I feel it is important to note that under RCW 40.14.030, the governor must still transfer his or her public records to the state archives regardless of their "privileged" status. Under RCW 40.14.030(2), the records would maintain their "privileged" status. Archiving would not be a violation of separation of powers. *See Nixon*, 433 U.S. at 450-55 (allowing for archiving of privileged documents).

For example, the spreadsheet provides the following description for one of the withheld documents: a "Briefing Document," No. PRR.15-20, dated April 20, 2009, authored by Executive Policy Advisor B. Nichols, received by Governor Gregoire, regarding the "Columbia River Biological Opinion." Clerk's Papers (CP) at 124. Yes, it is a communication from a top policy advisor to the governor, but the description is extremely vague and it is unclear how the document relates to the governor's decision making other than the fact that it involves some kind of briefing about the opinion. *See* majority at 18 (requiring that the communications to be for the purpose of gubernatorial deliberations, policy making, and decision making). This description alone hardly seems sufficient to allow the court to grant the governor the extremely strong presumption that it is privileged.

Another example is an e-mail authored by the governor's executive assistant and sent to "Executive Policy and Senior Staff." CP at 124. In its opinion, the majority states that "[t]his document . . . incorporated questions the governor wrote and directed her assistant to forward on to the policy staff . . . ." Majority at 22. Where did the majority get this additional information about the governor being the "true" author? It is not in the spreadsheet. The description of the document as an "Email" with an

21

attached "Briefing Document" containing the "Governor's handwritten notes" about "BPA/BiOp/Alcoa" again is insufficient to definitively conclude that this communication had anything to do with gubernatorial deliberations, policy making, and decision making. CP at 124. It is unclear what policy choices this document helps inform. Moreover, who are the specific "Executive Policy and Senior Staff" the log identifies as the recipients? The description of the recipients is much too vague. It is instructive to compare and contrast this "log" with the log found in *Judicial Watch*, 365 F.3d at 1129.

In *Judicial Watch*, the log is more detailed in its description of the document being withheld. *See id.* For example, the first entry describes the document as "[c]orrespondence control sheets forwarding proposed recommendations on pardon applications." *Id.* Another document is described as "providing [the aide's] . . . proposed recommendations on certain pardon applications." *Id.* Both descriptions show much more clearly how the documents relate to executive decision making. The documents relate to the president's exercise of his pardon power. In addition, both of these entries contain the full names of the recipients when their identities are not perfectly clear from their job titles. *Id.*

If, however, the majority defines "log" to include both the spreadsheet and the explanatory letter from the governor's general counsel, encompassing pages 121 to 123 of the clerk's papers, then I would say that it is likely sufficient. The accompanying letter provides much of the detail the majority seems to be referring to when it claims that the governor's log is sufficient. For example, it is the letter that explains that the e-mail from the governor's executive assistant transmits questions the governor posed to her policy staff, as well as some of these staff's responses. CP at 123. Moreover, the letter explains that the documents being withheld concern ongoing matters and if disclosed might inhibit the candor of her policy advisers and staff. These arguments and observations may seem overly technical, but when we are dealing with government secrecy and the public's right to know, we should hold the governor to a high standard.[15]

CONCLUSION

The majority did not have to create this powerful gubernatorial communications privilege in order to preserve the integrity of the executive

---

[15] I am not declaring that the combination of this letter plus this log provides a perfect example of what is required to obtain the presumption. Future courts should thoroughly scrutinize these logs to ensure that they contain sufficient detail.

23

branch—this is a poorly considered policy choice. The majority attempts to reassure us that the gubernatorial communications privilege will not "shroud all conversations involving the governor in secrecy and place them beyond the reach of public scrutiny" but at the same time gives great "deference to a governor's decision that material falls within the ambit of executive privilege." Majority at 18, 19. As a result of the majority's opinion, the governor is much freer to operate in the dark. The majority ignores the lessons of history that "strongly suggest[] that the theoretical dangers of government-by-fishbowl are greatly outweighed by the actual fact of excessive secrecy." Raoul Berger, *Executive Privilege in Light of* United States v. Nixon, 9 LOY. L.A. L. REV. 20, 21 (1975).

Seeing as the majority has decided to speculate about human behavior, I will speculate that it will be extremely tempting for the governor to cloak most communications in his or her office with the privilege. Concerned citizens will have to bring difficult and expensive lawsuits in order to get a closer look at their governor. The majority has "slammed the door on open government as it pertains to the governor." *Dann*, 109 Ohio St. 3d at 390 (Pfeifer, J., dissenting). This ruling likely will not destroy our

24

democracy, but it will affect its legitimacy in the eyes of the citizens of this state which is a start in that direction.

If the people of this state correct this decision by legislation or constitutional amendment, they surely will be holding their current governor to his promise. Future governors need to understand what our current governor apparently understands: that "'the insubstantial exercise of the privilege inevitably bears costs in credibility and public accountability, upon which each branch of government fundamentally relies.'" *Id.* at 381 (Resnick, J., dissenting) (quoting *Killington, Ltd. v. Lash*, 153 Vt. 628, 641, 572 A.2d 1368 (1990)).

Washington has a unique constitution and legal framework—courts must be open, citizens can enact or disapprove laws, and remove elected officials. Initiative 276 added assurance that secrecy could not surround government action. All this is predicated on the simple principle of open government. As another state judge once noted (also in dissent), "It is debatable whether [the gubernatorial communications privilege as previously recognized in other states] has inured to the benefit of [those states] or merely to the benefit of executives who wish to avoid embarrassment." *Id.* at 384 (Pfeifer, J., dissenting). If the majority thinks it

25

is improving Washington government by judicially creating this overly powerful privilege, it is mistaken. The new governor's disavowal supports this conclusion. "'No nation [or state] ever yet found any inconvenience from too close an inspection into the conduct of its officers, but many have been brought to ruin . . . only because the means of publicity had not been secured.'" *Reynolds v. United States*, 192 F.2d 987 (3rd Cir. 1951) (quoting EDWARD LIVINGSTON, WORKS, I, at 15). I respectfully dissent.