OSCN Found Document:VANDELAY ENTERTAINMENT, LLC v. FALLIN

 
 
 

 
 
 
 
 
 
 
 

 


 
 
 
 
 
 


 
 OSCN navigation


 
 
 Home

 
 Courts

 
 Court Dockets

 
 Legal Research

 
 Calendar

 
 Help
 
 





 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 
 
 

 
 
 
 VANDELAY ENTERTAINMENT, LLC v. FALLIN
2014 OK 109
Case Number: 113187
Decided: 12/16/2014
THE SUPREME COURT OF THE STATE OF OKLAHOMA
Cite as: 2014 OK 109, __ P.3d __

 
NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL. 

VANDELAY ENTERTAINMENT, LLC d.b.a. THE LOST OGLE, Appellant,
v.
MARY FALLIN, in her official Capacity as GOVERNOR OF THE STATE OF OKLAHOMA; STATE OF OKLAHOMA, ex rel. OFFICE OF THE GOVERNOR, Appellees.

ON APPEAL FROM THE DISTRICT COURT FOR OKLAHOMA COUNTY
HONORABLE BARBARA SWINTON, TRIAL JUDGE

¶0 Vandelay Entertainment, LLC d.b.a. The Lost Ogle filed suit in district court to obtain records that the Governor withheld when responding to Vandelay's Open Records Act request. The district court ruled the Governor had a common law privilege to withhold the records in question. Vandelay appealed and this Court retained the appeal. Upon review, we affirm on different grounds.

AFFIRMED.

Brady Henderson, ACLU of OKLAHOMA FOUNDATION, Oklahoma City, Oklahoma, Attorneys for Plaintiff/Appellant,
Neal Leader, Senior Assistant Attorney General, Oklahoma City, Oklahoma, Attorney for Appellee.

REIF, V.C.J.:

¶1 The legal controversy between Vandelay Entertainment, LLC d.b.a. The Lost Ogle and Governor Mary Fallin stems from the Governor's refusal to release certain records in response to a request by Vandelay[1] pursuant to the Open Records Act, 51 O.S.2011 and Supp.2013, §§ 24A.1 - 24A.29. The material facts underlying this controversy are not in dispute.

¶2 Vandelay asked Governor Fallin to release all records relating to her decisions regarding funding and programs under the Affordable Care Act. In responding to this request, Governor Fallin released over 51,000 pages of written material, but withheld 100 pages under a claim of "executive privilege." In a letter to Vandelay dated March 29, 2012, the Governor's general counsel explained: "In this document production, the Governor has invoked several legal privileges, including ones involving senior executive branch officials who are offering advice and counsel to the governor." (Emphasis added).

¶3 Vandelay filed suit in district court pursuant to § 24A.17(B)(1)[2] of the Oklahoma Open Records Act, to compel the Governor to release the records that were withheld. A copy of the March 29 letter from the Governor's general counsel was attached to Vandelay's petition. Vandelay disputed the Governor's claim of privilege, contending the withheld material was not specifically exempted from release by the Open Records Act, nor was it required to be kept confidential by any constitutional provision, statute, court decision or common law. In her answer, Governor Fallin acknowledged the March 29 letter and formally "invoked the doctrine of executive privilege with its deliberative process component" as a legal basis to withhold the material in question.

¶4 The parties presented the case for decision on cross motions for summary judgment. Citing 12 O.S.2011, § 2,[3] the district court ruled that Oklahoma had preserved common law to govern matters not otherwise addressed by the Oklahoma Constitution, statute or court decisions. The district court further ruled common law recognized a deliberative process privilege, but directed the Governor to submit a privilege log for judicial review to ensure the withheld material fell within the privilege.

¶5 Satisfied with the trial court's summary judgment recognizing her claim of privilege, Governor Fallin waived the privilege and released the 100 pages previously withheld. In doing so, the Governor filed a notice informing the court of the waiver and documents release. Copies of the particular documents were not filed in the record.

¶6 Attached to this notice was a letter from the Governor's general counsel to Vandelay explaining the Governor's decision. This letter stated that the Governor's had theretofore acted (1) "To ensure that the Executive Privilege/Deliberative Process Privilege continue to be recognized in Oklahoma" and (2) "To ensure frank, candid and confidential discussions essential to the Governor's decision making remain confidential, because senior advisors need to present the Governor with conflicting ideas, thoughts and opinions without concern over the consequences that would follow from compelled public dissemination of their advice." (Emphasis added).

¶7 This letter further explained that "the passage of time since the deliberations took place has resulted in the deliberative advice becoming far less sensitive." The letter also related that the Governor released the withheld documents out of concern for "transparency and openness in government" and "in consultation with many of those who provided the advice in the documents."

¶8 Despite the release of the withheld material, Vandelay brought this appeal, contending the district court erred in recognizing a common law privilege exempting the Governor from complying with Vandelay's Open Records Act request. Because this issue is a matter of broad public interest and there is a likelihood of future repeated conflict between the Governor's claim of privilege and the Open Records Act, this Court finds Vandelay's appeal is not moot. Firefighters Pension v. City of Spencer, 2009 OK 73, ¶¶ 4-5, 237 P.3d 125,129-130.

¶9 These same considerations dictate that this Court should retain this appeal for decision. Upon de novo review,[4] we agree with the trial court that Oklahoma Governors have a privilege to refuse to disclose advice they receive in confidence from "senior executive branch officials" when deliberating discretionary decisions and shaping policy. We do so, however, on grounds different than those articulated by the trial court.

¶10 In looking to common law, the trial court was no doubt persuaded by City of Colorado Springs v. White, 967 P.2d 1042 (Colo. 1998), cited in the Governor's summary judgment briefing. This Colorado case sets forth a thorough discussion of the common law origin and evolution of executive privilege in general and the deliberative process component in particular. Id. at 1047-58.

¶11 The Colorado opinion points out that executive privilege originated in the eighteenth and nineteenth centuries within the concept of the English "crown privilege." Id. at 1047. The opinion also notes that the deliberative process component of executive privilege is often referred to as "the common sense-common law privilege." Id. at 1048.

¶12 Having existed as an aspect of executive office prior to the adoption of the Oklahoma Constitution, we must conclude that the people at Statehood intended to preserve this common law privilege for the office of the Governor by the constitutional declaration, "The Supreme Executive power shall be vested in a Chief Magistrate, who shall be styled 'The Governor of the State of Oklahoma.'" Article 6, § 2 of the Oklahoma Constitution. In using the word "supreme" to modify the term "executive power," we believe the people intended to vest the Governor with the complete or full-range of executive powers that were recognized at the time the Oklahoma Constitution was adopted. In other words, executive privilege is not just a vestige of common law, but is an inherent power of the Governor.

¶13 In Ford v. Board of Tax-Roll Corrections, 1967 OK 90, ¶ 21, 431 P.2d 423, 428, this Court recognized that inherent powers are reflected in the separation of powers clause in Article 4, § 1 of the Oklahoma Constitution. This clause states "the Legislative, Executive and Judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others." (Emphasis supplied by the Ford opinion). Id. at ¶ 15, 431 P.2d at 427. While the Ford case dealt with a question concerning the inherent power of the judicial branch, the principles and analysis this Court applied in recognizing the inherent power of the judiciary are the same for recognizing and protecting the inherent powers of the other coequal branches.

¶14 In Ford, this Court concluded the "powers properly belonging" to a branch of government were those "which [are] essential to the existence, dignity and functions [of the branch]" and include inherent powers. Id. at ¶ 21, 431 P.2d at 428 (citation omitted). One test for inherent power is whether the subject matter is "so ultimately connected and bound up with [a branch's function] that the right to define and regulate [the subject matter] naturally and logically belongs to the [branch of government]." Id. Governor Fallin's claim of executive privilege to protect confidential advice from "senior executive branch officials" meets this test.

¶15 Several provisions in the Constitution addressing the express powers of the Governor reflect that the Governor has discretion in exercising those powers. Article 6, § 6 provides "The Governor [as] Commander-in Chief of the militia of the State . . . may call out the same to execute the laws, protect the public health, suppress insurrection, and repel invasion." (Emphasis added). Article 6, § 7 states "The Governor shall have power to convoke the Legislature . . . on extraordinary sessions [to consider subjects] as the Governor may recommend for consideration." (Emphasis added). Article 6, § 9 declares "At every session of the Legislature . . . the Governor shall communicate by message . . . and shall recommend such matters to the Legislature as he [or she] shall judge expedient [and] communicate . . . such matters as he [or she] may elect . . . ." (Emphasis added). Article 6, § 10 provides "The Governor shall have power to grant . . . commutations, pardons and paroles . . . upon such conditions and with such restrictions and limitations as [the Governor] may deem proper . . . ." (Emphasis added). Furthermore, the exercise of discretion is clearly implied in the general veto power, Article 6, § 11; the line item veto for appropriation bills, Article 6, § 12; and the appointment power, Article 6, § 13.

¶16 In addition, statutory law also gives the Governor discretion to do certain acts. For example, 74 O.S.2011, § 2 provides "The Governor shall have the power to remove any officers appointed by him [or her] . . . and may then fill the same as provided in cases of vacancy." (Emphasis added). 74 O.S.2011, § 5 states "Whenever the Governor is satisfied that any crime has been committed within the state, and that the person charged therewith has not been arrested, or has escaped therefrom, in his [or her] discretion he [or she] may offer a reward . . . for the arrest and delivery . . . of the person so charged . . . ." (Emphasis added). 74 O.S.2011, § 7 declares "The Governor of the State of Oklahoma is hereby authorized, at the expense of the state, and within the limitations of the appropriation . . . to maintain in such manner as the governor deems necessary and appropriate, the mansion provided for his [or her] occupancy by the State of Oklahoma and to pay all expenses connected with said occupancy." (Emphasis added).

¶17 The sheer number, diversity and magnitude of discretionary decisions entrusted to the Governor demonstrate the public interest is best served by the Governor seeking and receiving advice to aid in deliberations and decision-making. The United States Supreme Court has observed "[T]hose who assist [executive decision-makers] must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately." United States v. Nixon, 418 U.S. 683, 708 (1974)(superseded by statute on other grounds). The Court further observed that "[T]he confidentiality of [advisory] conversations and correspondence [is grounded in] the necessity for the protection of the public interest in candid, objective, and even blunt or harsh opinions in [executive] decisionmaking." Id.

¶18 The United States Supreme Court concluded these "considerations justif[y] a presumptive privilege." Id. The Court also concluded that such a privilege "is fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution." Id; accord, Freedom Foundation v. Gregoire, 310 P.3d 1252, 1258 (Wash. 2013) ("Refusal to recognize the gubernatorial communications privilege [to deny a legislatively authorized records request] would subvert the integrity of the governor's decision making process [thereby] damaging the functionality of the executive branch and transgressing the boundaries set by . . . separation of powers.")

¶19 In considering Governor Fallin's claim of privilege in the case at hand, we agree with the United States Supreme Court's view that "complete candor and objectivity from advisers calls for great deference from the courts" in determining the scope of executive privilege. 418 U.S. at 706. An Oklahoma Governor has no less need than the President of the United States to receive "candid, objective, and even blunt or harsh opinions" provided by "senior executive branch officials" as well as the need to refuse to disclose such advice that was solicited or received confidentially.

¶20 This subject matter is so ultimately connected and bound up in the Governor's executive branch function that the right to regulate receipt and disclosure of such advice by way of a privilege naturally and logically belongs to the executive branch. Ford, ¶ 21, 431 P.2d at 428. Stated another way, a privilege to protect confidential advice provided by "senior executive branch officials" is essential to the existence, dignity and functions of the Governor as chief executive and lies within the Governor's inherent power. Id. The principle of separation of powers expressly declared in Article 4, § 1 protects this privilege from encroachment by Legislative acts, such as the Open Records Act.

¶21 Unlike the claim of absolute privilege considered in United States v. Nixon, Governor Fallin has recognized that the deliberative process component of executive privilege that she claims in this case provides a qualified privilege. A qualified privilege is one that "applies in a particular instance if the purpose of the privilege is thereby served." City of Colorado Springs v. White, 967 P.2d at 1051. "The primary purpose of the [deliberative process] privilege is to protect the frank exchange of ideas and opinions critical to the government's decisionmaking [sic] processes where disclosure would discourage such discussion in the future[.]" Id.

¶22 A qualified privilege is also one in which the burden falls upon the government entity asserting the privilege. Id. at 1053. Had Governor Fallin not waived the privilege, she would have had the burden, upon in camera review, to demonstrate that the withheld documents fell within the privilege. Significantly, Governor Fallin's brief in support of her motion for summary judgment recognized this burden and requested the opportunity to demonstrate that the retained documents are protected by the deliberative process privilege.

¶23 Based on the limited summary judgment record presented for review, we need not determine the full scope of the deliberative process component of executive privilege, but must only delineate the burden in cases of advice solicited or received from "senior executive branch officials." We leave for a more appropriate case the issue of whether the privilege extends to advice solicited from parties outside of state government.

¶24 The burden in cases involving advice from "senior executive branch officials" includes a showing that the advice was (1) pre-decisional, and (2) deliberative (i.e., involved personal opinions, as opposed to purely factual, investigative material). Id. at 1052. In addition, the burden in the case at hand would also include a showing that (1) the Governor solicited or received advice from a "senior executive branch official" for use in deliberating policy or making a discretionary decision, (2) the Governor and the "senior executive branch official" knew or had a reasonable expectation that the advice was to remain confidential at the time it was provided to the Governor, and (3) the confidentiality of the advice was maintained by the Governor and the "senior executive branch official." While Governor Fallin did not define or specify whom she considers to be "senior executive branch officials," this group would reasonably include the Governor's general counsel and staff, the members of the Governor's cabinet, executive branch officers elected statewide, and executive branch agency heads appointed by the Governor.

¶25 Governor Fallin's answer and summary judgment briefing also acknowledged that the deliberative process privilege may even yield, when a substantial or compelling need for disclosure is shown. Once the Governor establishes that a document satisfies the criteria above, the burden shifts to the party requesting a document to show (1) a substantial or compelling need for disclosure, and (2) this need for disclosure outweighs the public interest in maintaining the confidentiality of the executive communication. Id. at 1051. A case in which there is reason to believe that documents may shed light on government wrongdoing may present a substantial or compelling need for disclosure that would outweigh the need for confidentiality. Id.

¶26 In recognizing the deliberative process component of executive privilege, we are mindful that the Legislature enacted the Open Records Act to assist the people in their oversight of State government and to aid the people in the exercise of their inherent power to alter or reform their government. Article 2, § 1 of the Oklahoma Constitution. This Court has said that public access to government files (1) "permits checks against the arbitrary exercise of official power and secrecy in the political process," (2) "gives private citizens the ability to monitor the manner in which public officials discharge their public duties," and (3) "ensures [performance] in an honest, efficient, faithful, and competent manner." Oklahoma Public Employees Association v. State ex rel. Oklahoma Office of Personnel Management, 2011 OK 68, ¶ 36, 267 P.3d 838, 851.

¶27 However, the deliberative process component of executive privilege is also grounded in a strong public interest. The Governor's need for confidential advice in deliberation of policy and decision-making is just as important to "[the people's] protection, security, and benefit, and to promote their general welfare," as the people's access to information. Article 2, § 1 of the Oklahoma Constitution.

¶28 By vesting the Governor with supreme executive power and delegating discretionary decision-making authority to the Governor, we believe the people placed checks on their access to certain types of confidential advice the Governor considers, and on legislative power to mandate disclosure of such advice. In place of on demand disclosure, in camera review and judicial balancing of competing public interests provide a middle ground accommodation when there is a question over whether the privilege exists or should be enforced. These safeguards fully protect the public from abuse of the privilege, while shielding communications ultimately found to warrant protection from public disclosure.

¶29 In conclusion, we hold that the trial court correctly ruled that the Governor has a privilege to protect confidential advice solicited or received from "senior executive branch officials" for use in deliberating policy and making discretionary decisions. We disagree, however, with the trial court's conclusion that this privilege rests solely upon common law. We hold that this privilege is a "power properly belonging" to the Governor's constitutional office as head of the executive branch and is protected by the separation of powers clause in Article 4, § 1. The need for confidential advice from "senior executive branch officials" for use in the Governor's deliberations and decision-making is "essential to the existence, dignity and functions" of the executive branch. Also, the need to protect such confidential advice is so ultimately connected and bound up with the executive function that the right to regulate disclosure of such confidential advice by way of a privilege naturally and logically belongs to the executive branch.

¶30 This privilege is not absolute, however, and is subject to the check and balance of in camera judicial review, in lieu of legislatively-mandated public disclosure. The Governor has the burden upon in camera judicial review to demonstrate that any material relating to such confidential advice satisfies the criteria set forth in this opinion. Even confidential advice that satisfies this criteria can be subject to disclosure where (1) the requesting party can show a substantial or compelling need for disclosure and (2) the need for disclosure outweighs the public interest in maintaining the confidentiality of the advice.

AFFIRMED.

¶31 COLBERT, C.J., REIF, V.C.J., KAUGER, WATT, WINCHESTER, EDMONDSON, TAYLOR, and GURICH, JJ., concur.

¶32 COMBS, J., concurs in part; dissents in part (by separate writing).

FOOTNOTES

[1] Section 24A.5 of the Open Records Act provides in pertinent part:

All records of public bodies and public officials shall be open to any person for inspection, copying, or mechanical reproduction during regular business hours; provided:

1. The Oklahoma Open Records Act, Sections 24A.1 through 24A.28 of this title, does not apply to records specifically required by law to be kept confidential[;]

. . . .

5. A public body must provide prompt, reasonable access to its records but may establish reasonable procedures which protect the integrity and organization of its records and to prevent excessive disruptions of its essential functions.

. . . .

51 O.S.2011 § 24A.5.

[2] This section provides in pertinent part:

B. Any person denied access to records of a public body or public official:

1. May bring a civil suit for declarative or injunctive relief, or both, but such civil suit shall be limited to records requested and denied prior to filing of the civil suit;

. . . .

12 O.S.2011, § 24A.17(B)(1).

[3] This section states:

The common law, as modified by constitutional and statutory law, judicial decisions and the condition and wants of the people, shall remain in force in aid of the general statutes of Oklahoma; but the rule of the common law, that statutes in derogation thereof, shall be strictly construed, shall not be applicable to any general statute of Oklahoma; but all such statutes shall be liberally construed to promote their object.

12 O.S.2011, §2.

[4]An order that grants summary relief disposes solely of law questions and is reviewable by a de novo standard of review. Under this standard, an appellate court claims for itself plenary, independent and non-deferential authority to re-examine a trial court's legal rulings. Manley v. Brown, 1999 OK 79, § 22 n.30, 989 P.2d 448, 455 n.30 (citations omitted).

COMBS, J., concurring in part, dissenting in part:

¶1 While I concur with the majority's determination that the Governor possesses a qualified executive privilege based upon her inherent powers as Governor under the Oklahoma Constitution, I write separately to specify the nature of the privilege and to more clearly highlight its boundaries. The majority's use of the label "deliberative process privilege" to describe the constitutional privilege that shields the Governor's communications with her advisors blurs the line between distinct facets of executive privilege in a manner likely to cause confusion in the future.

¶2 The majority describes in detail the unique constitutional role of the Governor and the importance of candor in her communications with her advisors. The executive privilege that protects such candor is built in part upon the decision of the Supreme Court of the United States in United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.ED.2d 1039 (1974) (superseded by statute on other grounds), which the majority favorably quotes at several points when it compares the duties and powers of the Governor to those of the President. The qualified executive privilege described by the Court in Nixon has also been labeled the "chief executive communications privilege" in order to distinguish it from the larger category of privileges that may fall under the umbrella of executive privilege. See Matthew W. Warnock, Stifling Gubernatorial Secrecy: Application of Executive Privilege to State Executive Officials, 35 Cap. U. L. Rev. 983, 984-85 (2007).

¶3 Such specificity is necessary in order to distinguish the chief executive communications privilege from the common-law-based deliberative process privilege theory relied upon by the trial court in this cause and adopted by the majority. The former is specific to the chief executive and rooted in the Constitution while the latter applies more generally to government actors in the executive branch and originated at common law. Both were originally federal doctrines that have been adopted to varying degrees by the states. The difference was thoughtfully set out by the United States Court of Appeals for the D.C. Circuit in In re Sealed Case, 121 F.3d 729 (D.C. Cir. 1997), where the court stated:

[w]hile the presidential communications privilege and the deliberative process privilege are closely affiliated, the two privileges are distinct and have different scopes. Both are executive privileges designed to protect executive branch decisionmaking, but one applies to decisionmaking of executive officials generally, the other specifically to decisionmaking of the President. The presidential privilege is rooted in constitutional separation of powers principles and the President's unique constitutional role; the deliberative process privilege is primarily a common law privilege.

¶4 By relying heavily upon Nixon and the Governor's unique constitutional role and powers, while at the same time determining that it is the common-law-based deliberative process component of executive privilege that controls here, the majority engages in a blending of two distinct legal theories of executive privilege. The Supreme Court of Alaska, in Gwich'in Steering Committee v. State, Office of the Governor, succinctly described the difference:

[w]e stated in Capital Information Group v. State, Office of the Governor that we considered the terms "executive privilege" and "deliberative process privilege" to be synonymous for purposes of that discussion. But the two terms are not identical. Instead, the deliberative process privilege is a "branch" of a broader group of governmental privileges. The roots of the deliberative process privilege lie in the common law; it protects the mental processes of government decisionmakers from interference, not constitutional notions of separation of powers.

10 P.3d 572, 579 (Alaska 2000) (emphasis added) (footnotes omitted). The majority opinion appears to supply a constitutional basis for the deliberative process privilege stemming from the separation of powers doctrine, which is a significant departure from the federal precedent responsible for both distinct branches of executive privilege. Further, the deliberative process privilege, as the In Re Sealed Case court noted, can apply to other executive branch entities besides the chief executive, and the majority's blending of the two ideas makes it difficult to distinguish where the Governor's constitution-based executive privilege ends and the deliberative process privilege begins.

¶5 Recognizing a clear distinction between the two doctrines helps prevent such confusion. While the chief executive communications privilege may be more all-encompassing with regards to documents and more difficult to surmount, it is also limited in nature and less broadly applicable than the deliberative process privilege. Most importantly, the chief executive communications privilege should not be construed so as to extend privileged status to all communications that may be made to the Governor. The court in In re Sealed Case considered this issue as well, and reached the following conclusion:

[w]e believe therefore that the public interest is best served by holding that communications made by presidential advisers in the course of preparing advice for the President come under the presidential communications privilege, even when these communications are not made directly to the President. Given the need to provide sufficient elbow room for advisers to obtain information from all knowledgeable sources, the privilege must apply both to communications which these advisers solicited and received from others as well as those they authored themselves. The privilege must also extend to communications authored or received in response to a solicitation by members of a presidential adviser's staff, since in many instances advisers must rely on their staff to investigate an issue and formulate the advice to be given to the President. We are aware that such an extension, unless carefully circumscribed to accomplish the purposes of the privilege, could pose a significant risk of expanding to a large swath of the executive branch a privilege that is bottomed on a recognition of the unique role of the President. In order to limit this risk, the presidential communications privilege should be construed as narrowly as is consistent with ensuring that the confidentiality of the President's decisionmaking process is adequately protected. Not every person who plays a role in the development of presidential advice, no matter how remote and removed from the President, can qualify for the privilege. In particular, the privilege should not extend to staff outside the White House in executive branch agencies. Instead, the privilege should apply only to communications authored or solicited and received by those members of an immediate White House adviser's staff who have broad and significant responsibility for investigating and formulating the advice to be given the President on the particular matter to which the communications relate.

121 F.3d at 751-52 (emphasis added) (internal citations omitted).

¶6 Complete candid objectivity from advisors may call for great deference from the courts, Nixon, 418 U.S. at 706, but the same cannot be said for potentially unsolicited advice and lobbying directed at the Governor that comes from outside the office of the chief executive, even if such advice factored into the decisional process on an issue. To allow otherwise would make the privilege overbroad and allow it to grow beyond its role in protecting the unique role of the chief executive.

¶7 In conclusion, I agree that the Governor's communications with her advisors are subject to a qualified executive privilege that has its basis in the Governor's inherent powers and the Constitution. However, that privilege is distinct from the common-law-based deliberative process privilege and I write separately to stress that I disagree with the majority's decision to blend these two branches of executive privilege into a hybrid entity.

 

 





 Citationizer© Summary of Documents Citing This Document
 
 
 Cite
 Name
 Level
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 Cite
 Name
 Level
 
 
 Oklahoma Supreme Court Cases
 Cite
Name
Level

 1967 OK 90, 431 P.2d 423, FORD v. BOARD OF TAX-ROLL CORRECTIONS
Discussed
 2009 OK 73, 237 P.3d 125, STATE ex rel. OKLA. FIREFIGHTERS PENSION AND RETIREMENT SYSTEM v. CITY OF SPENCER
Discussed
 2011 OK 68, 267 P.3d 838, OKLA. PUBLIC EMPLOYEES ASSOC. v. STATE ex rel. OKLA. OFFICE OF PERSONNEL MANAGEMENT
Discussed
 1999 OK 79, 989 P.2d 448, 70 OBJ 2752, Manley v. Brown
Discussed
Title 12. Civil Procedure
 Cite
Name
Level

 12 O.S. 2, Common Law to Remain in Force in Aid of General Statutes
Discussed
Title 51. Officers
 Cite
Name
Level

 51 O.S. 24A.1, Short Title
Cited
 51 O.S. 24A.5, Open and Confidential Records
Cited
Title 74. State Government
 Cite
Name
Level

 74 O.S. 2, May Remove Officers Appointed
Cited
 74 O.S. 5, Reward for Criminal's Arrest
Cited
 74 O.S. 7, Maintenance of Governor's Mansion
Cited